H. T. Benton v. Commissioner. Elizabeth Benton v. Commissioner.
H. Benton v. Commissioner
Docket Nos. 22358, 22359.
United States Tax Court
1950 Tax Ct. Memo LEXIS 97; 9 T.C.M. (CCH) 811; T.C.M. (RIA) 50223; September 20, 1950
*97 Deductible expenses or purchase price - Section 23 (a) (1) (A). - Payments made during the taxable year were purchase price of a business to which the taxpayer was taking title and in which he had an equity and were not deductible as rent. Following Judson Mills, 11 T.C. 25. Depreciation. - Reasonable useful life of cabs used in a taxicab business determined. Arthur Glover, Esq., and Walter G. Russell, C.P.A., 310 Amarillo Bldg., Amarillo, Tex., for the petitioners. Donald P. Chehock, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in income tax of the petitioners, H. T. Benton and Elizabeth Benton for the calendar year ended December 31, 1945, of $13,394.19 and $13,284.19, respectively. The proceedings were consolidated for hearing. The issues are: (1) whether payments aggregating $45,000 made by petitioners under a so-called lease agreement are deductible as business rental expenses as claimed by them, and which were disallowed by the respondent; (2) what amounts for depreciation on their taxicabs and losses from sales of cars are petitioners entitled to within the *98 taxable year. Findings of Fact Petitioners H. T. Benton and Elizabeth Benton are husband and wife, residing at Amarillo, Texas. The income and deductions here in issue were those of the marital community and were so reported by petitioners in their tax returns for 1945 filed with the collector of internal revenue for the second district of Texas. The husband, H. T. Benton, is hereinafter referred to as petitioner. He was born in 1911, quit school after the seventh grade, and from 1928 to 1936 was employed as a cab driver in Amarillo. In 1936 he operated a cab of his own. In 1937 he had a small cab operation in Childress, Texas, but in 1939 sold out and returned to Amarillo. He continued in the taxicab business in Amarillo, first with the City Cab Company and then with Safeway Cab Company, operating on a "kick-back" basis around $1.50 a day. During this time he bought two new automobiles, financing them through Plains City Finance Company (hereinafter called Finance Company) a partnership composed of W. A. Mays and three associates (hereinafter called Mays et al.). In October, 1943, he left the Safeway Cab and was in the used car business for two months. In 1943 he netted $923.78 *99 from his cab operations and $500 from used car business. In January, 1944, he bought four cars in Kansas City, financing them through the Finance Company. Later in the month he purchased the Rainbow Taxicab for $3,000, paying $500 cash and borrowing the balance from the Finance Company, thereby acquiring three more cabs and seven permits. During 1944 he netted $12,049.99 from his operation of the Rainbow Taxicab. He owed the Finance Company $5,500 in January 1944, but had paid same by the end of the year. For the first three months of 1945 he netted $3,854.85 from his Rainbow Taxicab business. His then net worth was $7,931, plus an equity in a duplex he bought in 1943. On March 28, 1945, he entered into a written agreement with Mays et al., the owners of the Yellow Cab & Baggage Company of Amarillo (hereinafter called Yellow Cab), under which agreement the petitioner paid them in 1945 the $45,000 here in controversy. The agreement in substance was as follows: The preamble designates it a "Lease Contract" and Mays et al. are termed the "lessors" and petitioner, "lessee." It then proceeds: "WHEREAS, Lessors are the owners of the following described motor vehicles, viz: [Here *100 follows an itemized list of 13 motor vehicles, the motor number of each being given, and included therein were 2 Chevrolet school buses, 2 Chevrolet sedans, 1 Buick Fordor, 2 Dodge sedans, 1 Plymouth sedan, 1 Chevrolet truck, 2 Ford buses, 1 International bus, 1 Dodge Fordor sedan.] together with contracts under which fifteen (15) additional motor vehicles are operated in taxi service under ODT and City permits belonging to lessors, together with ODT and City permits and franchises authorizing lessors to operate the motor vehicles above described belonging to lessors, together with certain transportation contracts between the three railways and two airlines serving the City of Amarillo, Texas, together with a month to month only rental agreement covering that certain building now occupied by lessors located at the northeast corner of the intersection of Third and Taylor Streets in the City of Amarillo, Texas, together with one or more taxicab stands and locations in the City of Amarillo, Texas, together with telephone numbers 5242, 5243 and 5244, together with the exclusive right to use the trade name of "Yellow Cab & Baggage Company" in the City of Amarillo, Texas; and, "WHEREAS, *101 lessee is the owner of the following described motor vehicles, viz: [Here follows an itemized list of 9 motor vehicles, the motor number of each being given, and included therein were 5 Chevrolet Fordor sedans, 1 DeSoto sedan, 1 Chevrolet sedan and 2 Ford Fordor sedans.] together with ODT and City permits and franchises to operate the same, which motor vehicles lessee has heretofore operated under the name and style of 'Rainbow Taxi'; and, "WHEREAS, said lessee desires to lease all of the above described equipment from lessors for a period of ten (10) months and to procure an option to purchase such equipment at the end of ten months, and in order so to do is agreeable to giving said lessors security for the compliance by lessee of the terms and conditions of the Lease Contract hereinafter contained, therefore, it is agreed and contracted by and between the parties hereto as follows: [Italics supplied.] "I. "For the purpose of guaranteeing lessors in the full and faithful performance by lessee of all of the terms and provisions of this Contract * * * [Here follows lessee's transfer and assignment to lessors of above motor vehicles]. "In consideration of the premises, *102 lessors have this day and do by these presents lease and let unto lessee for a period of ten months commencing with the date 1st day of April, 1945, ending at midnight on the 28 day of February, 1946, each and every item of the above described personal property including the motor vehicles and other equipment belonging to lessors and first described herein as well as the motor vehicles and equipment this day conveyed unto lessors by lessee, which motor vehicles and the permits, franchises and contracts in connection therewith will be used by lessee solely for the purpose of carrying on and conducting a taxicab and light transfer business under the name and style of 'Yellow Cab & Baggage Company.' "The consideration which the lessee shall pay the lessors for the use of the above described equipment and privileges is as follows: "(1) The sum of $50,000.00 shall be due and payable to lessors at Amarillo, Texas, as follows: "The sum of $5,000.00 on the 1st day of May, 1945, and a like sum of $5,000.00 on the 1st day of each consecutive calendar month hereafter during the term of this Lease Contract. "(2) Said lessee shall at all times keep and maintain in taxicab and transfer service *103 not less than twenty-six (26) motor vehicles (either by ownership of such vehicles himself or under lease arrangement with the owners thereof similar to the lease arrangements under which lessors are now operating the fifteen (15) motor vehicles hereinbefore mentioned) and shall keep and maintain such motor vehicles covered with public liability and property damage insurance * * * and lessee shall keep the ODT and City permits authorizing the operation of all such twenty-six motor vehicles in good standing. "(3) [Here lessee is required to keep the equipment in good working order, keep the licenses and permits in good standing and pay all taxes of every kind, including ad valorem taxes.] "(4) [Here lessee is to pay all rents, utilities, telephone bills, etc.] "(5) Lessee shall at his sole cost and expense replace any item of the above described items of equipment which may be destroyed or taken out of service for any reason. "(6) [Here lessee is to conduct the business in an efficient manner and hold lessors harmless for damages from its operation.] "(7) Any equipment purchased by lessee to replace any of the above described items of equipment shall be acquired in the *104 name of and as the property of Yellow Cab & Baggage Company and shall be and become the sole and absolute property of lessors, it being the intention of all parties hereto that lessee is and shall be obligated to keep a like amount of vehicles belonging to lessors in such taxicab service at his own cost and expense. "(8) Lessee shall discontinue the operation of Rainbow Cabs and use of the name 'Rainbow Cabs' during the tenure of this Lease Contract. "Lessee shall be and is hereby given the exclusive right and option to purchase all of the above described equipment belonging to lessors together with lessors' ODT and City permits, lessors' rights to use and occupy the building and stands now occupied by lessors above described together with the exclusive right to use the name 'Yellow Cab & Baggage Company' in the City of Amarillo, Texas, together with the above described telephone numbers at any time within a period of five days after the expiration of the term of this Lease Contract upon the following terms and conditions, viz: "Lessee shall pay unto lessors the total sum of $35,000.00 at Amarillo, Texas, in the following manner: "The sum of $5,000.00 on or before thirty (30) *105 days from the date that lessee exercises his option to purchase such property, and the sum of $5,000.00 shall be due and payable to lessors on or before the same day of each consecutive month thereafter until said total sum of $35,000.00 shall have been paid lessors; such deferred installments shall bear interest from maturity at the rate of 6% per annum and for the purpose of securing the payment of such deferred installments which shall be evidenced by the promissory note of lessee said lessee shall execute and deliver unto lessors his chattel mortgage lien covering each and every item of the above described equipment as well as any replacements or substitutions thereof as well as all ODT and City permits, franchises and licenses authorizing the operation of such motor vehicles as taxicabs, together with any lease agreements which lessee may have or receive from lessors covering the operation of motor vehicles belonging to third parties. "[Here lessee is to operate the business 'without supervision or control in any respect on the part of lessors,' but lessors are given the right to enter the premises where the equipment is kept for purpose of inspecting same.] "[It is here *106 provided that if lessee should fail to carry out any term or provision of this contract, then lessors are 'given the right without previous notice or demand to declare this contract terminated, null and void and to repossess themselves of each and every item of the above described equipment and property and permits, licenses, franchises and privileges, and to eject and evict lessee, his servants, agents and employees therefrom without in any manner being guilty of trespass, and any and all damages occasioned by the premises are hereby expressly waived by lessee, and upon such default on the part of lessee, lessee shall without further action upon the part of lessors forfeit unto lessors each and every item of the above described property which lessee has this day conveyed unto lessors as well as all of his right, title, estate or equity in or to the same together with all moneys theretofore paid by lessee to lessors hereunder, such amount being agreed upon as liquidated damages, * * * and from and after such default lessee shall not thereafter use or attempt to use the name "Yellow Cab & Baggage Company" or any of the above mentioned telephone numbers or locations, and the failure *107 on the part of lessee to so cease' shall give lessors the right of injunctive relief.]" Under this agreement petitioner at once took possession of and alone operated the Yellow Cab business until February 4, 1946, when he formed a partnership with W. A. Mays, he to own one-third and Mays two-thirds interest therein, and this partnership operated and owned the business until dissolved on February 1, 1948, and thereafter petitioner alone has owned and operated same. Prior to petitioner's acquisition of the business from Mays et al., it had been owned and operated from 1943 to April 1, 1944, by Blackwell & Hicks, who sold it on April 1, 1944, to Mays et al. for $60,000, payable $35,000 cash and the remaining $25,000 in five monthly payments of $5,000 each, all of which was paid when due. Properties acquired by Mays et al. from Blackwell & Hicks included 27 automobiles (some of which were not then being used as cabs), 18 city permits and 18 O.D.T. permits, [1] shop and office equipment, trade name, good will, cab stands, telephone numbers and exclusive contracts with the three railroads and two airlines entering Amarillo. [2]
*108 The net profits from the operation of the Yellow Cab business under the different ownerships and managements were as follows: In 1943 Blackwell & Hicks, $44,000; in 1944 (4/1/44 to 3/1/45) Mays et al., $52,881; in 1945 (4/1/45 to 12/31/45), petitioner, $70,567; [3] in 1946, petitioner and Mays, $54,285; in 1947, petitioner, $45,416. Mays et al., prior to their purchase of Yellow Cab, had had no experience in the taxi business. Soon after April 1, 1944, they also bought a small cab company known as Safeway, and hired its owner, Hamilton, as night manager of Yellow Cab, but within two months re-sold Safeway to Hamilton, and he was no longer with them. On May 20, 1944, they sold Finance Company and W. A. Mays took over active management of Yellow Cab. He encountered difficulties in its operation, did not like the business, and early in 1945 Mays et al. decided to sell same, and Mays, acting for the firm, sought in a quiet way to find a purchaser, but without success. Recalling that petitioner had always met his payments to the Finance Company and was making *109 a success of the Rainbow Cab, Mays approached petitioner, suggesting that he buy or lease Yellow Cab. Petitioner advised that he had no money with which to buy. Mays, realizing that petitioner "hadn't been accustomed to dealing in large figures" at first discussed no terms, so the matter was talked between them several times, over a period of weeks, the negotiations finally resulting in the execution of the socalled rental agreement. Prior thereto Mays showed petitioner that the income from the railroad contracts was around $5,000 per month. At the time the agreement was executed: (a) it was the desire and hope of Mays et al. that petitioner would exercise the option to buy contained therein, and petitioner's hope that he would be able to do so; (b) both parties knew that it contained a forfeiture clause in the event of default, and further contained no provision for transfer of the Rainbow Taxicab properties back to the petitioner under any conditions. These points were discussed by the parties prior to execution, and as a result petitioner took out life insurance to protect his wife should he die before fulfillment of the contract. When the lease agreement was made, Mays et al. *110 considered that in addition to their net profit from Yellow Cab through sales of equipment and depreciation reserves, they had recovered all of their investment therein except $28,210.30. [4]
From April 1, 1945, to February 1, 1946, petitioner alone managed and operated the business, but did not claim to be its owner, and he was designated as its manager in the 1945 Amarillo city directory. However, he received all revenue from the business and paid all bills and expenses incurred therein, including repairs on cars. He pocketed the proceeds from all cars sold and personally paid for all new cars acquired, and any difference in cost on replacements. He paid all car license fees and agreed to or paid all ad valorem taxes. Feeling his incompetency to deal with the transportation companies when anything arose with reference to the railroad or air contracts, he called upon Mays to look after the same, and in November 1945, Mays, for Yellow Cab, negotiated a new contract with Braniff Airways. In 1945 Mays, at petitioner's request, managed the business for ten days while *111 petitioner went to Detroit to the world series. The Yellow Cab was the largest taxicab concern in Amarillo and its trade name was valuable and was recorded in the Assumed Name Files of the county. Its telephone numbers were well known to the public and it owned more ODT and city permits than any other cab during the years in question. Its railroad and air line contracts netted about $5,000 monthly. The value of its intangible assets was much larger than the value of its motor vehicles and other physical properties, and the total value of Yellow Cab was largely in excess of $35,000 during all of 1945 and 1946. Petitioner placed all his Rainbow cabs and ODT and City permits in the name of Yellow Cab, as the agreement required. The short life of motor vehicles in the cab business required a constant replacement of cars and under the agreement petitioner was to replace same as needed at his cost and same were to belong to the Yellow Cab, and accordingly, between September 24, 1945, and December 12, 1945, he bought six motor vehicles. Toward the close of the ten month period, the war having ended, the volume of business was less and the profits were reduced some 20 to 25 per cent. *112 Petitioner, feeling prosperous, had paid $6,000 for a home, and also had failed to make adequate provision for payment of his income taxes. He also needed new motor equipment, and for these reasons felt unable to pay the seven $5,000 monthly payments required under the purchase option, and so explained to W. A. Mays. Mays thereupon formed a partnership with petitioner, and within the five day limitation period they exercised the option under the agreement, paying in cash the $35,000 required which they borrowed from a bank, payable in monthly installments of $2,500, all of which they paid. Petitioner owned two-thirds and Mays one-third interest in the partnership, and petitioner was manager of the business, and the firm continued to own and operate Yellow Cab until about February 1, 1948, when Mays sold his one-third interest therein to petitioner for $25,000, payable $1,000 a month, and thereafter petitioner owned and operated the business alone. The tax consequences of the transaction in question were given no consideration by any of the parties thereto. W. A. Mays reported as ordinary income his portion of the $45,000 received from petitioner in 1945. For the year 1945 petitioners, *113 in their income tax returns, claimed rental deductions of $45,000 paid Mays et al., but the Commissioner determined that such payments constituted a capital investment and disallowed same as rental deduction. Petitioners, in claiming depreciation in their returns, computed the basis of the cabs at cost, deducted no salvage value and depreciated same at the rate of 50 per cent per annum, but claimed no depreciation on the motor vehicles, the possession of which they acquired under the lease agreement from Mays et al. The Commissioner, conforming to his determination of ownership, allowed petitioners depreciation also on the cars they secured from Mays et al., but determined the reasonable life of most of the cars in question to be three years, and computed depreciation accordingly. Due to the war it was almost impossible to secure new automotive equipment of any kind, and practically all of the taxicabs and motor cars involved in the depreciation issue were second hand when acquired by petitioners, and due to their usage in the taxicab business, the reasonable useful life of each was eighteen months. Opinion Respondent contends that the $45,000 claimed by petitioners as deductible *114 for business rental expenses was properly disallowed by the Commissioner because section 23 (a) (1) (A) of the Internal Revenue Code, granting deductions for such expenses, by its express terms applies only to payments "of property to which the taxpayer has not taken or is not taking title or in which he has no equity." The rule ordinarily applied in determining whether a transaction is a lease or a conditional sale is further restricted by this language of the code, and for the taxpayer to be entitled to deduction for rental payments, he must show affirmatively that the property for which the so-called rental payments have been made is not property to which he has taken title, or is taking title, or in which he has an equity. This we think the petitioners have failed to do. Title to the property in question petitioners had not acquired, but we can not say from the evidence that they were not acquiring title thereto, and the evidence does show that from the payments made and the contract and consideration upon which they were based petitioners did acquire and have an equity in the property, as defined and held in Judson Mills, 11 T.C. 25. [Cf. *115 Chicago Stoker Corp., 14 T.C. 441.] There the property in volved was machinery used in textile mills, while here it consisted of a taxicab business, including motor vehicles, licenses, permits and franchises, together with transportation contracts with railroads, taxicab stands, use of trade name, etc. There, as here, monthly payments were made under a so-called lease agreement and were designated as rentals, and upon completion of the stipulated monthly payments, an option of purchase was given. There, as here, the value of the property was such that upon completion of the aggregate amount of the so-called rental payments the additional amount for which the taxpayer could acquire title to the property was such as to give to the taxpayer an equity in the property. Here, under the so-called lease agreement, petitioner acquired possession and exclusive use of a taxcab business known as the Yellow Cab and Baggage Co., for which he agreed to pay $50,000 in tne monthly installments of $5,000 each, with the "exclusive right and option to purchase" same within five days after the expiration of the "lease" by paying $35,000 additional in monthly payments of $5,000 each. Whether *116 by the payment of $50,000 in so-called rentals and the right to take title by paying $35,000 additional created an equity in the property depends upon its value. Petitioners concede this to be the test, and in their brief state: "* * * H. T. Benton had acquired no equity in any property when he made his rental payments, and at the end of the lease term, the assets which had been leased did not have a real value equal to the option price. * * *" If the value of the property (taxicab business) did not equal the option price ($35,000), we would agree with petitioners' conclusion, but the facts do not warrant this assertion. Immediately following above statement, petitioners' brief continues: "* * * Many hours might be spent in arguing the potential value of the business on February 1, 1946, but no argument could carry the weight of the honest opinion of the parties involved; they knew its value best, and their knowledge and opinion as evidenced by their actions should be controlling in this respect." In other words, petitioners want us to accept $35,000 as the value of the property because the "knowledge and opinion" of the parties to the so-called lease agreement "as evidenced *117 by their actions" in fixing the option price at that sum "should be controlling." To do so would be to disregard other evidence carrying more "weight" and more persuasive as to its value. Indeed other "actions" of the grantors in the so-called lease agreement impeach this sum as being the value of the property. They had bought it a year before for $60,000 and there is nothing to indicate that it was worth less when the lease agreement was made. It had netted them $54,000 for the year immediately preceding the lease agreement and netted petitioner $70,000 (including the $45,000 here in question) for his first year's operation. It is not reasonable to assume that property for which the parties had paid $60,000 within a year and had netted them during that time a profit of $54,000 would have been worth only $35,000, or that they would have sold it for that sum. The $85,000 which petitioner was required to pay under the "rental agreement" before he took title or became owner of the business, would seem to reflect more clearly its value, or the value attributed to it by the parties than the so-called option price. Under the lease agreement, the aggregate of the so-called "rental" payments *118 which petitioner was irrevocably obligated to pay constituted about 59 per cent of the entire consideration. This ratio of payments to the total consideration, considered alone, would tend to show that by such payments petitioner acquired an equitable interest in the property. Commenting upon the disproportionate ratio of so-called rental payments to property value as indicating they were not bona fide payments for rent, in Watson v. Commissioner, 62 Fed. (2d) 35, where the payments in issue constituted about 43 per cent of the entire consideration, the court said (p. 36): "* * * It is unthinkable that the payment of $47,000 which is about 43 per cent of the entire consideration, upon property valued at $109,900 is an annual rental, for that is the approximate amount received by the 'lessor' during the year 1924. * * *" If the value of the property here was less than the option price, then petitioners acquired no equity in the property. The converse of this, however, is true, and if its value or market price exceeded, or materially exceeded the option price, then it would appear that petitioners did have an equity therein. [5]
*119 Petitioners cite the figures contained in the depreciation schedule of the partnership income tax return for 1945 in support of their contention as to the value of the business. Since all the parties to the so-called lease agreement treated the $45,000 as rental payments and the $35,000 as capital assets for income tax purposes, it is to be expected that the figures contained in their income tax returns and the depreciation schedule attached thereto would be in conformity therewith. Statements contained in income tax returns are not conclusive as to value. Oral testimony and other circumstances frequently impeach the correctness of such figures. The item of $10,000 therein covering all intangible assets, including good will, we think was grossly inadequate. Petitioners' evidence as to the value of the business, either at the time the lease agreement was made, or at the date of its expiration, was neither clear nor convincing. Mays, their principal witness, who negotiated the contract for himself and his associates, on direct examination was asked this question: "Q. What did you determine that the, assuming that the good will that you originally paid for had not increased, what *120 did you determine that the business was worth, the underpreciated value of the business, about the time you made this lease?" To which he answered: "A. It seems to me it was around $17,500.00 to $20,000.00, somewhere in that immediate figure." The effect of this testimony, however, was greatly impaired, if not destroyed, when, on cross examination, he testified that he did not know what he considered the business worth, as shown by the following excerpt from his testimony: "Q. What [did] you, acting for yourself and your associates, considered [consider] the business worth on March 28, 1945? [Date of lease agreement]. "A. I cannot recall back those days everthing that a fellow might have wiggled through his mind in negotiations. It is impossible. "Q. Do you want to state that you didn't have any opinion as to what it was worth? "A. I wouldn't state. I don't know what my opinion was at that time. * * *
"THE COURT: The question is: At the time you made this contract, you had in your mind what you thought the property was worth on a straight-out sale. "THE WITNESS: Your Honor, this man couldn't buy this property. He had no money. "THE COURT: The question *121 is whether or not you had at that time in your mind what the property was worth if you had a sale. "THE WITNESS: I didn't have a definite figure in mind that I recall at this time." Petitioner did not testify as to the value of the business or what he considered it to have been worth, and no other witness except Mays testified with reference thereto. The record on the whole convinces us that the value or market price of the business was greatly in excess of the option price of $35,000. The fact that in every sale of the business during the proximate period involved (excluding the transaction in question) it brought a much larger sum so indicates. The selling price is a good test of value. That the annual net profits from the business in each year during this period greatly exceeded this amount is also convincing. An essential element in determining the value of a going business is what profits may reasonably be expected from its operation. The net profits in 1943 were $44,000; in 1944, $52,000; in 1945, $70,000, including the $45,000 in question; in 1946, $54,285; and in 1947, $45,416. These figures alone should be sufficient to refute a $35,000 valuation. The uniformity of *122 earnings also indicates the stability of the business, a prime factor in determining value. The fact that from 1943 to 1947, inclusive, the business was operated under four different ownerships tends to discount petitioners' contention that it was the particular kind of operation rather than the business itself which determined its income and hence its value. Petitioners assert that the option to purchase was not exercised and this indicates that petitioner had no equity in the property. It is existence of the equity rather than its acquirement which determines the applicability of the Code's provision. However, petitioner did exercise the option, not alone but with Mays, on the two-thirds and one-third basis. Mays was an astute business man and we think his willingness to acquire a one-third interest in the business under the option indicates that he regarded the option as one of value. His wisdom and that of petitioner in so doing was vindicated by the profits that they reaped from the business and the fact that Mays within two years sold his one-third interest for $25,000, more than twice the sum he had paid therefor. We find that petitioner did acquire and have an equity in *123 the property, which fact alone is determinative of the issue here. We also think that while some of the circumstances indicate a rental agreement, the evidence on the whole shows that the intent of the parties to the so-called rental agreement and its primary purpose was the acquisition of Yellow Cab by petitioner. We hold that petitioners have failed to sustain their burden of proof in showing a non-existence of equity in the business, and also have failed to show that under the so-called rental agreement the petitioner was not taking and acquiring title to same, and hence we sustain respondent's determination that the $45,000 payments were not deductible as rent, but constituted a capital investment. There is no merit in the petitioners' alternative plea that if the $45,000 was an expenditure for capital assets, the life of said assets or their value had become worthless during 1945 to the extent of the $45,000 paid, and hence deductible. Such claim is groundless as shown in our discussion of value of the business. On the depreciation issue we approve the Commissioner's action in allowing petitioners depreciation also on the cars acquired from Mays et al., since they are entitled *124 thereto. However, we have found from the evidence that the average useful life of each of the cars in question was eighteen months, and the Commissioner's action in computing the useful life at three years is reversed and a recomputation will be made accordingly. Decisions will be entered under Rule 50. Footnotes
1. Issued by Office of Defense Transportation during war years, without which cabs could not operate; only 1 permit could issue to each 1,000 population. ↩
2. Through rail passengers were transported between depots in Amarillo, air passengers to and from the airport.↩
3. This sum includes $25,567, reported as net profit in petitioners' income tax return, plus the $45,000 in question.↩
4. They base these figures on the depreciation schedules of the partnership income tax returns for 1944 and 1945.↩
5. * * * When the option price is less than the market price of the property for the purchase of which the option is given, it [the option] may have present value and may be found to be itself compensation for services rendered. * * * Commissioner v. Smith, 324 U.S. 177↩.